UNITED STATES CUSTOMS SERVICE,
WASHINGTON, D.C., et al., Petitioners,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

National Treasury Employees
Union, Intervenor.

No. 87–1128.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 4, 1987.
Decided Aug. 23, 1988.

Pamela P. Johnson, Atty., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol., William E. Persina, Deputy Sol., and Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, were on the brief for respondent.

Cary P. Sklar, with whom Lois G. Williams was on the brief for intervenor, National Treasury Employees Union. Gregory O'Duden, also entered an appearance for intervenor.

Thomas M. Bondy, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., William Kanter, Atty., Dept. of Justice, and Joel W. Nomkin *, Atty., Dept. of Justice, were on the brief for petitioners.

Before ROBINSON, EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The Federal Labor Relations Authority ordered petitioner, the United States Customs Service, to bargain with the National Treasury Employees Union over the Union's proposal to delay the implementation

---

* At time the brief was filed.

of a new program to streamline the inspection of vessels arriving at Pacific ports. The Union proposed that the Customs Service forego implementing the new program "pending a study to be carried out, within six months, by NTEU to evaluate on [sic] the impact of [the program] on bargaining unit employees." The FLRA held that the proposal "does not interfere with management's substantive right to implement the [program]," and is therefore a negotiable "procedure" under section 701(b)(2) of the Federal Service Labor-Management Relations Act, 5 U.S.C. § 7106(b)(2) (1982). *United States Customs Service*, 25 F.L.R.A. 248, 253 (1987). We conclude that the FLRA erred, and therefore grant the petition for review.

### I. BACKGROUND

Pursuant to the Tariff Act of 1930, 19 U.S.C. § 1431 (1982), and the regulations implementing it, 19 C.F.R. Part 4 (1987), all vessels arriving from foreign origins are required to present certain documents to Customs inspectors before any passengers or cargo are taken on board or leave the ship. Because this requirement of "formal entry" often causes long delays, a vessel may request a streamlined "preliminary entry," which enables it to begin loading or unloading prior to completing a formal entry. *See* 19 U.S.C. § 1448(a) (1982); 19 C.F.R. § 4.8 (1987).

To effect a preliminary entry, it has been the practice for a Customs inspector to board the vessel upon its arrival, inspect the manifest and other pertinent documents, and perform other duties to ensure that vessel, crew, and cargo appropriately may enter the United States. On May 9, 1984, however, the Customs Service issued a directive announcing its intention to implement a new preliminary entry program in its Pacific Region, which consists of ports in California, Oregon, Washington, and Hawaii. The agency notified NTEU, which represents Customs inspectors in the region, to that effect.

Under the new program, referred to as the Radio Preliminary Entry Test (RPET) Program, a vessel meeting certain conditions not pertinent here may request and obtain preliminary entry before its final arrival at port. This is accomplished by the vessel transmitting the information on its manifest, by radio or other electronic means, to a representative on shore who, in turn, files that information with the Customs Marine Office.

The RPET was initiated as a one-year experiment. The idea was to make more efficient use of Customs inspectors, the better to deal with the agency's increasing workload. According to an agency official, the RPET program enables the Service "to avoid assigning an Inspector to go down and physically spend time aboard the ship ... so that [it] can more effectively use him in the clearance of cargo and also in other enforcement type activities...."

In response to the agency's May 9 notice, NTEU informed the Customs Service that it wanted "to negotiate the substance, impact, and implementation" of the RPET. The agency declined to bargain.

Pursuant to the Federal Service Labor-Management Relations Act, it is "an unfair labor practice for an agency ... to refuse to consult or negotiate in good faith with a labor organization" over conditions of employment. 5 U.S.C. § 7116(a)(5) (1982). The duty to bargain thus covers "personnel policies, practices, and matters ... affecting working conditions," 5 U.S.C. § 7103(a)(14) (1982), except insofar as bargaining would be inconsistent with certain reserved authority, or "management rights." These rights are defined in section 701(a) of the Act, 5 U.S.C. § 7106(a) (1982), as:

the authority of any management official of any agency—

(1) to determine the mission, budget, organization, number of employees, and ...

(2) in accordance with applicable laws—

\*    \*    \*    \*    \*    \*

(B) to assign work ... and to determine the personnel by which agency operations shall be conducted....

This relatively straightforward reservation of rights to management, free of the duty to bargain, is vastly complicated, however, by § 701(b), 5 U.S.C. § 7106(b) (1982), which provides in relevant part:

> Nothing in this section shall preclude any agency and any labor organization from negotiating—
>
> (1) at the election of the agency, ... the technology, methods, and means of performing work; [or]
>
> (2) procedures which management officials of the agency will observe in exercising any authority under this section....

The Customs Service invoked this management rights provision when it refused to bargain with NTEU, stating that the Union's proposal "is not negotiable because it would interfere with the agency's right to determine the methods and means of performing work." NTEU did not accept the agency's negotiability determination, and instead made several specific proposals, the only one of which at issue in this case provides:

> That the implementation of the [RPET] be withheld pending a study to be carried out, within six months, by NTEU to evaluate on [sic] the impact of the directive on bargaining unit employees.

The agency also considered this specific proposal to be nonnegotiable because, as it wrote to the Union, it was "but an attempt to delay submission of [the Union's] proposals for up to six months." Accordingly, the agency refused to bargain with the Union and implemented the RPET on July 1, 1984.

NTEU charged that the Customs Service committed an unfair labor practice by implementing the RPET unilaterally, without first bargaining with the Union. The FLRA's Regional Director issued a complaint, and the case was heard before an Administrative Law Judge (ALJ). The ALJ concluded that the Union's proposal was negotiable and upheld the complaint, reasoning as follows:

> [T]he thrust [of the Union's proposal] is that implementation of the radio entry program be withheld pending a study

within 6 months by the Union on its impact upon [bargaining] unit employees. This proposal, insofar as it concerns management's procedures in establishing RPET, does not prevent the agency from acting to exercise its authority under Section 7106.... While the reason for deferring implementation may not meet with management's approval, the basic request of [the Union] is for a delay thereof up to 6 months. As such it does not interfere with management's rights under [section 7106].

*United States Customs Service,* ALJ Decision, 25 F.L.R.A. 260, 269 (1985).

The FLRA affirmed by a divided vote. The majority only restated the obvious (the proposal is "not intended to preclude the Agency from carrying out the proposed RPET program, but merely delays the implementation pending a Union study to be completed within six months"), and then, like the ALJ, concluded that "[i]t does not interfere with management's substantive right to implement the RPET," *United States Customs Service,* 25 F.L.R.A. at 253; it relied upon citations to its prior decisions as the only clues to its reasoning. Chairman Calhoun, dissenting, noted that the proposal "acts as an absolute bar to implementation until the Union completes its study, even where the Agency determines that implementation before that time is necessary." The proposal therefore, he concluded, substantially interferes with "the Agency's right to implement a new program to accomplish its mission in the most efficient and effective manner [which] necessarily includes the right to determine when to implement the new program." *Id.* at 258. The Customs Service petitioned for review in this court, and the FLRA cross-applied to enforce its order.

## II. ANALYSIS

The central issue in this case is whether the NTEU's proposal is a "procedure" over which the Customs Service is statutorily required to bargain. The FLRA's argument is that the proposal is procedural under the "acting at all" standard that it explicated in *United States Customs Ser-*

*vice, Region VIII,* 2 F.L.R.A. 25 (1979). Under this standard, the FLRA contends, a proposal that merely delays an agency's exercise of its reserved management rights, but does not prevent the agency from "acting at all," is a negotiable "procedure" within the meaning of section 7106(b)(2).

█ In *Department of Defense v. FLRA,* 659 F.2d 1140, 1153 (D.C.Cir.1981), we approved the "acting at all" standard as "a reasonable and natural construction of the statutory language, rendered by the agency given responsibility for administering the statute." Application *vel non* of this standard, however, depends entirely upon how the proposal at issue is characterized. If it can fairly be regarded as "purely procedural," then it is negotiable "unless the proposal, if adopted, would prevent the agency from 'acting at all,' " *National Fed'n of Fed. Employees, Local 1745 v. FLRA,* 828 F.2d 834, 840 (D.C.Cir. 1987); the agency's exercise of management rights may be delayed by its adherence to the proposed procedure, but that does not exclude the proposal from the agency's duty to bargain. If, however, the proposal "stand[s] close to the uncertain border between procedure and substance, [then it] is deemed nonnegotiable if its adoption would directly interfere with management's reserved authority." *Id.; see American Fed'n of Gov't Employees v. FLRA,* 819 F.2d 306, 308 (D.C.Cir.1987); *National Fed'n of Fed. Employees, Local 1167 v. FLRA,* 681 F.2d 886, 892 n. 8 (D.C. Cir.1982).

█ The position of the Customs Service in this case is that the Union's proposal here is surely not "purely procedural," such that the FLRA's "acting at all" standard applies, and, if it is even close to the procedural border, then it is still nonnegotiable because it would directly interfere with management rights. The agency offers two reasons. First, it argues, the proposal is not procedural at all, in the relevant sense, because it deals only with procedures the *Union* will observe—*i.e.,* conduct a study of the impact that the RPET program would have on its mem-

bers; it does not propose any "procedures which *management officials of the agency* will observe in exercising any authority," 5 U.S.C. § 7106(b)(2) (1982)—here, the undisputed right to implement the RPET program, which is encompassed within management's reserved right to determine the "means of performing work." 5 U.S.C. § 7106(b)(1). Second, the Customs Service contends that the proposal is not a negotiable procedure because it "directly interferes" with management's right to implement the RPET program; indeed, it says, the proposal "would stop the program dead in its tracks." The proposal cannot be considered "procedural," in other words, because during the proposed six months' delay, the agency would be barred from implementing the RPET program and remitted, instead, to a "means of performing work" that is not of its own choosing, contrary to section 7106(b)(1). We agree on both counts.

With regard to the first point, we approach this case still plagued by "doubt whether [the "acting at all" standard] is either theoretically sound or practically susceptible of principled application," because the results it yields depend so vitally on how the FLRA chooses to characterize the particular proposal under scrutiny. *National Fed'n of Fed. Employees, Local 615 v. FLRA,* 801 F.2d 477, 481, 482 (D.C. Cir.1986) (hereinafter *Local 615* ). Assuming it is applied to a proposal properly characterized as "purely procedural," the standard may not be an unreasonable interpretation of the statute, such as to be vulnerable under the deferential standard of review mandated generally by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), and more particularly by *Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (FLRA's interpretation of its enabling legislation must be accorded "considerable deference"). If the FLRA applies it indiscriminately, however, then it may lead to arbitrary and indefensible results. That, we believe, is what happened in this case. As applied here, the "acting at all"

standard is inconsistent with the plain language of section 7106(b).

The FLRA says that the Union's proposal here "does not interfere with management's substantive right[s]" because the proposed procedure "merely delays the implementation" of the RPET program, as opposed to preventing the agency from acting at all. *United States Customs Service*, 25 F.L.R.A. at 253. But to what proposed procedure is it referring? According to FLRA's brief, the "procedure" NTEU has proposed is "the [agency's] holding in abeyance of [the RPET] program pending completion of the union's study."

This position is peculiar in the extreme. At the risk of belaboring the obvious, we note the fallacies within it. First, going back to basics, we repeat the language of the statute: "Nothing in this section shall preclude any agency and any labor organization from negotiating ... *procedures which management officials of the agency will observe in exercising any authority* under this section...." The "procedure" identified by the FLRA in its brief does not entail anything for "the agency [to] observe in exercising [its] authority" to choose the means by which work will be performed; it would instead require the agency to refrain from exercising its authority, for up to six months. To call holding a program in abeyance a "procedure" is, at the least, unnatural. More important, the statute does not broadly oblige the agency to bargain, as the FLRA's argument suggests, over "procedures which management officials of the agency will observe." Instead, the agency's duty is to bargain over "procedures which management officials of the agency will observe *in exercising any authority under this section....*"

The Union's hold-in-abeyance proposal is not directed at *how* the agency will implement its program; it would serve rather to place on the bargaining table the agency's decision as to *when* to implement its new program. A decision regarding the timing of a program's implementation, however, is part and parcel of the reserved management right to determine the means by which an agency's work will be performed. It is a substantive, and not at all a procedural, decision; as such, it is reserved by statute to agency management, unfettered by collective bargaining obligations. As we said in a case where the FLRA itself held that a union proposal was a nonnegotiable intrusion upon management's rights:

> Without a doubt, *the right to determine what work will be done, and by whom and when it is to be done,* is at the very core of successful management of the employer's business, whether a private-sector enterprise or the public service operations of a federal agency. It follows necessarily that this right is essential to management's ability to achieve optimum productivity, and accordingly to the agency's ability to function in an effective manner. The [FLRA]'s construction of Section 7106(a) as a reservation of this invaluable right to management, thereby insulating it from dilution at the bargaining table, is thus fully obedient to the congressional command that the Act be interpreted in a manner consistent with the exigencies of efficient government.

*National Treasury Employees Union v. FLRA*, 691 F.2d 553, 563 (D.C.Cir.1982) (emphasis added, footnote omitted); *see National Treasury Employees Union v. FLRA*, 810 F.2d 1224, 1227 (D.C.Cir.1987).

In sum, because the proposal in this case is not "purely procedural," the "acting at all" standard is inapplicable. Further, even if it were procedural in some sense, no separate elaboration would be needed to see that the proposal is also nonnegotiable because it directly interferes with the reserved right of agency management to determine when a decision about the means of performing agency work will be implemented.

We recur to our concern with the plasticity of the "acting at all" standard. Even if NTEU's proposal were arguably procedural, and even if it did not directly interfere with a reserved management right, the FLRA's application of the "acting at all" standard in this case could not

be sustained as reasoned decisionmaking for two reasons. First, the FLRA applied the standard incorrectly to the proposal involved in this review proceeding. It (implicitly) reasoned as follows: (1) if a proposal does not prevent an agency from acting at all, (2) then it does not directly interfere with reserved management rights, and therefore, (3) it will be regarded as a proposal concerning a "procedure" within the meaning of section 7106(b)(2). This analysis puts the cart before the horse, for as we have explained, the "acting at all" standard can logically be applied only when a proposal can properly be considered "purely procedural" in the first, not the third, place; it cannot be used to determine the anterior question of whether a proposal to postpone agency action directly interferes with management rights. The FLRA's own past decisions and the decisions of this court establish that a proposal to postpone agency action can directly interfere with management rights, quite apart from any inquiry into whether it would prevent the agency from acting at all. *See National Treasury Employees Union*, 810 F.2d at 1226 (upholding FLRA decision that proposal is nonnegotiable on grounds that it interfered with "the right to assign work [which] includes discretion to determine when the work which has been assigned will be performed") (quoting *National Treasury Employees Union*, 17 F.L.R.A. 379, 380 (1985), in turn quoting *American Fed'n of Gov't Employees, AFL–CIO*, 8 F.L.R.A. 347, 377 (1982), *rev'd as to other matters sub nom. Department of Justice v. FLRA*, 709 F.2d 724 (D.C.Cir. 1983)); *see also National Treasury Employees Union*, 691 F.2d at 563.

■ Second, the FLRA appears to have applied the "acting at all" standard inconsistently as between the proposal before us and another proposal it considered in another aspect of this very decision. The FLRA recognized that timing is integral to the basic management rights to assign work and to determine the means of performing it when it held that NTEU's proposal that the Customs Service delay implementing the RPET "pending clarification of the goals [of the program] and guidelines for

an analysis of the test's results," *United States Custom Service*, 25 F.L.R.A. at 249, was not a negotiable procedure. *Id.* at 255. The FLRA observed that

> the agency is prevented from deciding to develop guidelines during or after implementation of the RPET or from deciding not to develop guidelines at all. The proposal therefore interferes with the Agency's right to determine how the RPET will be implemented. As such it directly interferes with management's determination to institute the RPET program in violation of management's right to determine the "methods" and "means" of performing the agency's work under section 7106(b)(1).

*Id.* The FLRA did not in its decision, and does not in this court, explain why the proposal it held nonnegotiable (which on its face is at least arguably "procedural" in that it would require the agency to "observe" something "in exercising" reserved management rights) directly interferes with management's rights, while the proposal before us (which requires union participation in determining when a program is to be implemented) does not directly interfere with management's rights. This is not reasoned decisionmaking.

In closing, we again direct the FLRA to attend to our admonition in *Local 615. See Defense Logistics Council v. FLRA*, 810 F.2d 234, 241–42 (D.C.Cir.1987) (Williams, J., concurring). For again, the FLRA's handling of the "acting at all" standard "causes [a] panel to doubt whether it is either theoretically sound or practically susceptible of principled application." *Local 615*, 801 F.2d at 481. Whatever merit the standard may have when it is applied properly, to a proposal properly within its scope, the FLRA's use of it seems at times to be mechanical, displacing any reasoned consideration of the proposal before it, and yielding results that are not only patently inconsistent, *see id.* at 481–82, but also, as in this case, utterly irrational. And so again we caution the FLRA: "We doubt ... whether the court will be able to live indefinitely with a test that conceals rather than explains the FLRA's policy judgments

which ultimately determine whether substantive management rights have realistically been impaired." *Id.* at 483.

### III. CONCLUSION

The Union's proposal directly interferes with rights reserved to the management of the Customs Service under section 7106(a) and (b)(1). As a consequence, the proposal is not negotiable and the agency committed no unfair labor practice in refusing to bargain with NTEU over it. The FLRA's contrary conclusion is set aside, and the petition for review is

*Granted.*